Number 1, Case Number 2580-27 Thank you. Good morning, Your Honors. Mr. Havener, before I begin, Your Honors, I'd like to ask the Court, if at all possible, the courtesy of reserving three minutes for rebuttal. Of course. Thank you. You'll have to keep track of that, though. I will. All right. May it please the Court. Reverse and rebuttal. Reverse the lower court's grant of summary judgment and return this case to that court for further proceedings. That, in fact, is the only proper and just path that can take this court to a proper resolution of this case. How can I say that? I can explain that in one word, Mahmoud. The Supreme Court's decision in Mahmoud v. Taylor last year is a treatise addressing every issue before the court in this case. Justice Alito's decision effectively ends inquiry because Mahmoud is dispositive of every issue before the court today. Well, we can talk about how it's dispositive on the- I'm sorry, Your Honor. I said we can talk about how it's dispositive on the free exercise claims, but would you address how it's dispositive on the due process claim? I believe, Judge, that with respect to the 14th Amendment due process claim, bear with me a moment. It clearly acknowledges the supremacy, and I use that word intentionally, of parental rights when it comes to the decision-making regarding the upbringing, health, and welfare of their children. There's no doubt about that. There's no argument. There's a hundred years more than that of Supreme Court precedent establishing the supremacy of that act. Certainly, there have been cases where that has been debated, but at the end of the day, Mahmoud is the final piece that was moved to checkmate with respect to that question. Counsel, on the fundamental right issue in your due process claim, recent cases have discussed the need to narrow that right rather than just speak of it in a general sense. In this case, you mentioned, you know, a hundred years of precedent that talks about parental rights, but what is sort of the narrowest way you would describe the right that you're invoking? The right to make decisions regarding your children's health and well-being? You would just describe it in the general sense? You wouldn't narrow it in any way? One moment. For starters, Judge, there's no doubt that I believe that the policy at play here places an undue burden on that fundamental right. Here, the district had a clear history of policies that required its personnel throughout the district to withhold any notice or notification to the parents concerning the adoption and use of the child, sex-deviating names and pronouns at the request of the child, and at the request of the child not to tell the parents. Now, this is not just some minor administrative regulation a school district employee has to follow. There's evidence clearly here that the employees knew the failure to do so would result in discipline, likely termination. Point in fact, the lower court itself acknowledged that. More importantly, if I may, Your Honor, here, the court itself, and I mean the lower court now, acknowledges the importance and ultimately dispositive nature of Mahmoud referencing itself, referencing that fact in his order granting summary judgment. In a prescient way, I'm sorry, Judge, go ahead. I wanted to ask also, what conduct are you actually challenging? By that I mean, what specifically did the teachers do or not do that you are raising as being at issue in this appeal to burden your client's rights? Well, clearly, using alternate names and pronouns, calling their daughter by a male name and male pronouns, and in doing so, in compliance with the district's policy, not telling the parents that that was going on. And in this case in particular, and what's particularly egregious, this is a child, I believe 13 or 14 at the time, who had a qualifying disability under the Rehabilitation Act of 1973. That disability was based on mental health issues. Now, there's no reasonable basis anybody could come to the conclusion that with full knowledge of that disability on the part of the district, that you would not notify a parent of an obvious expression of a mental health disorder, that being gender dysphoria. In point of fact, your honors, in every school district in this country, you cannot give a student an ibuprofen or an aspirin with our prior written consent by the parent. We're not talking about that. We're talking about your argument, which I understand to be on the substantive due process claim, that the school had an affirmative duty in this setting to advise the parents, the plaintiffs here, of the choices that their daughter had made. That's what we're talking about. And I don't think Mahmoud supports that aspect of your claim. Mahmoud wasn't about what, it wasn't a substantive due process claim, and it wasn't about what duty a school has to advise parents of matters affecting their children's well-being. So what authority are you relying on, on the substantive due process claim? Well, I think, your honor, Mahmoud addresses that, not just implicitly, but expressly in dealing with the First Amendment free exercise claim. Right. Now, I want to know about the substantive due process claim. Well, I don't think, or at least my position is, your honor, you can't simply ignore the dicta with respect to the First Amendment free exercise claim and somehow believe that none of that applies to a substantive due process claim. In the end, the court specifically states that this right, that is the parent's right to raise their child and make decisions regarding the health and well-being of that child, is fundamental. And in speaking with respect to Yoder, which is, in fact, a 14th Amendment case, they talk about it clearly, that that right is immutable and primary and almost exclusive. The school district was relegated to a subservient status in the reference in the case, and I would suggest that it's tertiary when it comes to those kind of decisions. So, they may not have expressed, I'm sorry, go ahead. Let me move to the expression claims. Will you tell me how it is that this case is on point with Mahmoud, as you seem to be arguing, and Yoder? There was nothing compelling the students here to participate in any kind of curriculum or policy. There was nothing compelling participation that somehow, as in, for instance, in Mahmoud, where the children were being required to attend a class. Well, in a particular book that they were viewing, and the parents weren't allowed to opt their child out of that. How does that relate to what's happening here? Your Honor, I believe that... This was something that the school decided to respect with their policy, the students, not just this student, but every student's choice, as far as their name preferences and pronoun preferences. This is about the school's policy to respect the student's choice, not about the school imposing some kind of curriculum on the student and their parents. For starters, Judge, the court specifically says that coercion is not necessary. It can be much more subtle, and as it was in this case, insidious, quite honestly. What was the coercion here? What was the coercion of the students? It was more subtle and less direct, Judge, but here you have young children at the watershed moment in their lives, 12, 13, 14, 15 years old, being influenced by authority figures who they respect and must follow, not just in the classroom, but in the hallways, in the lunchroom and cafeteria, on the athletic field. So it is a pervasive undermining of the parents' right to make decisions regarding the upbringing of their child and instilling in that child their sincerely held religious beliefs by offering a, not just controversial, but frankly, counter ideology and ideas to these children. So it is coercion in a very subtle and manipulative sense. And the court acknowledges in Mahmoud that that type of action violates and burdens a parent's free exercise, right? So if I'm understanding correctly, the coercion is the fact that they offer this choice to the student at all? The choice to use a nickname or a different name and a choice to use certain pronouns, is that the coercion? The coercion is, as much as anything else, Judge, the subtle influence on young minds at a fundamental point in their life when they don't have an opportunity to really comprehend what's going from authority figures, number one. Number two, coercion is not necessary in the classic definition of that term. Coercion can be very subtle and almost unapparent or non-apparent. So I don't think it's fair to simply say because we didn't require the students to go to a class or read this book, but we did require our staff to call the student by an alternate name, thereby facilitating in a pedagogical setting, as I said, throughout the course of the school day. So I do think Mahmoud is dispositive on that issue, Judge, with respect to this. And if the court will allow, I'd like to reserve the rest of my time for rebuttal. Thank you, yes. Thank you, Your Honors. I always feel so short when I get to these things. Good morning, Your Honors. May it please the court, counsel. This, I think, is a relatively straightforward case of just applying summary judgment principles. The defendants in the district court brought a motion for summary judgment saying that the plaintiffs had failed to present evidence in support of their prima facie case. And the court agreed that there was a complete lack of evidence in support of these claims. And therefore, summary judgment was entered. And I don't think that needs to be changed, altered, or otherwise overturned at this level. We still, after a full briefing on this matter three years in, we don't have any evidence that, for example, in the 2020-2021 school year, when the student at issue was allegedly referred to by varying names and or pronouns, that there was a district policy whatsoever governing those things. This didn't happen under the color of state law. These were teachers who testified that their interest was simply, well, the student asked me to. Or I heard somebody else using that name in the hall, and I figured that's what she went by. This isn't a district policy. And in fact, it was never no policy. There was never a district policy at best. There was a district procedure. And that distinction is important because a policy has to be adopted by the school board. Whereas a procedure is just explaining to staff how they're going to follow a requirement that exists already. This isn't, it was never the district's requirement in essence. It was a requirement that came down from the President of the United States at the time. Issuing executive orders saying we're going to apply Bostock to issues of gender identity, and you have to comply with that or you lose your Title IX money. So the procedure that was in place was basically just to explain how to comply with that requirement. What we're going to do is if someone asks you, we're not influencing or coercing anyone. In fact, it's a completely internal procedure that no student ever would have known about. We're not going to, but if someone asks you and says, hey, I want to go by a different name or pronoun, honor that. It's as simple as that. Council, in the following school year, which I think is 2022-2023, which is also my understanding the last year the student attended the school, there was a policy in place and my understanding is the evidence that that policy may have been invoked in relation to this student. The universe of evidence is an email exchange between a former teacher, a middle school teacher, and the student. And first of all, do I have that correct? Well, that would be a procedure, so not a policy, and I don't believe there was evidence. And in fact, what the lower court found was that plaintiffs slash appellants had argued, and frankly, strenuously, that that communication violated district policy. And so therefore, because that communication was in violation of district policy, it could not be in furtherance of state action. Well, the email exchange itself, though, starts with the student reaching out to the teacher to talk about, I think, a school board meeting where they were discussing the policy procedure, however you want to phrase it, at issue here. So it seems to me that it's at least relevant to the discussion of that policy. Would you agree with that? I mean, it is relevant, certainly, and I do think if you read what the teacher says, what he explains to the student is this doesn't change anything. Nothing's different. We always, you know, it's just telling us what we have to do, what the requirement is, which is we're going to honor student names and pronouns. So there was a discussion of that. I don't know if that portion would be deemed outside of district policy, frankly. It seems pretty straightforward. Well, what is your view on how that email exchange, because, again, my understanding is that's the only potential evidence within that school year. How does that relate to the summary judgment grant and our assessment whether or not there's a genuine issue material effect? Sure. I think there must be, to show governmental action, there has to be an official municipal policy that guides that action. I don't think there's any reason to believe that that email exchange was in any way guided by an official municipal policy. It was, frankly, outside of municipal policy and unknown to the district itself. It wasn't, hey, you should email students. No one said, hey, email students about these issues, you know, or respond to a student in a certain way if they email you. It had nothing to do with that. It was simply the only procedure at issue at that time was if a student asked you to use a different name or pronoun, do it. And that's really all there was to it. There was never, there's nothing in that procedure, contrary to what appellants repeatedly say, that required or even suggested that teachers should withhold information from parents or lie to parents or deceive parents. And, in fact, you know, as was the case here, the very first time the parents inquired of any teachers, they volunteered the information. Oh, we know your student by a different name. Well, what about that duty on the substantivity process claim? What about the idea of an affirmative duty, at least in this instance, to advise parents of a matter that certainly is of interest to the parents, which is essentially their children's choice of identity? Are there any cases, really, that go to that issue that you can point us to, at least at the Supreme Court level? None, frankly, no. I mean, I think there are cases, certainly, such as, you know, Runyon v. McCurry, that states that parental rights in terms of, you know, educational policy are not absolute. And I think that's especially true, whereas here, what we're talking about is an internal policy. It's not a curricular aspect in any fashion. Well, it's an internal policy that recognizes a child's choice as to their identity and does not have any requirement that parents are informed. And I understand you're saying that, you know, they encourage a child to inform parents, but in certain circumstances, the parents are not informed and the child doesn't tell them. And I'm saying, is this something so fundamental that regardless of a child's choice, that it shouldn't be up to the school to determine one way or another what parents should be told, that choices their children make about their identity should be given to parents? They have that right in terms of their upbringing and guiding their upbringing, whether you agree with it or not. Do you see what I'm saying? Is this distinct from so many other things? I mean, I understand how broad this could get, you know. What impacts their well-being is broad. But we're not just talking about well-being here. We're talking about identity. I think you just hit the nail on the head in saying that, you know, what a student decides to tell their parents about their identity is between the student and the parents. That's not what I'm saying. I'm saying, does the school have an obligation regardless? No, absolutely not. And if they did, they would be violating the student's fundamental right to, one, exist and their right to free expression. I mean, think back to, say, teenagers. Does the student's right always outweigh the parental right regardless? No, I mean, of course not. No. Right? Right. I mean, I would certainly agree.  I just don't think that there's an instance here where there's an affirmative duty to go tell a parent, hey, I think your student may be having gender identity issues. One, they're not qualified. There isn't a may here. This student had asked to be referred to. By a different name. By a different name and pronoun. Pronoun. One was a tree. One was a body of water. Those were the two names. And it was a pronoun issue, I believe, right? I don't know that that's true. Okay. I don't think that was ever established. All right. One of the teachers did testify. She might have.  But there was no clarity. All right. What if it had been? What if it was more certain? What if it was a more certain issue as to gender identity? Does that make any difference? You know, I don't think so. Because part of that would be, I mean, I guess the why of it. You know, what we're talking about is, does that violate the appellant's fundamental religious rights in raising their children? And I don't know that the district would have any reason to know. Well, I'm talking now about the fundamental right to parent and raise your child the way you want to raise your child. Okay. I mean, it's not, you know, it's certainly not a medical issue. And to direct your child's upbringing. I'm just asking if identity might be something so fundamental, so basic, that you treat it differently. I just don't think it is. In that, you know, for one, kids try on various hats throughout their teen life. I don't think this is necessarily, you know, if someone says, hey, I want to be a parent. Well, what I'm saying is, is it up to the school to make that determination? How serious it is or not serious? Shouldn't the parents be told? I mean, it seems awfully Orwellian to me to require a school to, upon hearing, hey, this student made some decision about their life, I have to go tell their parent right now. We're talking about a decision about identity again. I would be asking you the same thing if the student was identifying as a furry animal, which is, you know, also happens. I mean, it's a real thing. And I don't know, I assume under this policy, maybe that wouldn't be conveyed either. But I'm saying, is identity so fundamental that parents should know that? I don't think so. And I don't think that was the law at the time, certainly. I mean, I think this was a requirement that came down from the president, period. I don't think they had an opportunity or a possibility of saying, hey, we're not going to follow that. You know, that was the law. So they honored it. And that was what they were told to do. And I don't think there's any getting around that, whether we, you know, think it's fundamental or not. I just, I don't agree. And I don't think it's, you know, I just don't think it's the school's place to inform on students about virtually anything, unless it's illegal, unless it violates the law in some fashion. And this obviously didn't. In fact, it comported with the law. I just, I can't see an affirmative duty there. Because, you know, then where do you stop that? Well, okay, well, there's a parent. I'd love to know if my kid is sitting alone at lunch. I'd love to know if he's socializing well. And if you think that's trivial or not. I'm saying maybe there is a line that can be drawn. I'm asking you, is there a line that can be drawn on issues concerning a child's identity? And the answer is no. Okay. It just isn't. Because it's not different from, you know, anything else that a teenager may decide, oh, I'm lonely, I'm going to kill myself. You know, wouldn't a parent want to know that? Shouldn't the school have informed them of that? Isn't that a very important issue? They see this kid isn't socializing well. They're, you know, seem depressed. They seem maybe even, you know, disturbed. You know, I don't know. I mean, is the school necessarily going to have to monitor everything, every bit of a student's behavior? This is an issue where a student, it would only come up if a student asked. And, you know, they have to opt in to this to begin with. And there's just no, I think it's a very slippery slope to say there's an affirmative duty on schools on any issue, including identity, to inform on students. It just, it goes too far. Counsel, with respect to the policy, it would appear to direct district employees to respect privacy in proactively withholding information from parents. No. Is that the case? No. How is it not? How is it not? I don't know where you get withhold information from parents, but with respect to privacy. I think respect privacy in this context means if a kid says, I want to be called by they, them pronouns, you don't inquire further into, hey, well, why is that? What is, what's going on in your life? I mean, tell me about your gender identity. You know, nor would a teacher, you know, have the right upon learning that to, you know, spread the news to other students or staff, et cetera. Oh, this student's queer. That's what respecting their privacy means. It just means, hey, if they tell you, you know, I want to go by different pronouns, you say, okay, and leave it. There's no, hey, withhold that from parents. And, you know, there's no evidence that any parent has ever had that information withheld by the district at any point. So, and, you know, there's testimony from teachers saying, well, we wouldn't have done that, and we don't believe the procedure requires that. So that's the only evidence in the record. There's nothing in that procedure that requires withholding information from a parent. And, in fact, in the 2023-24 school year, the procedure was revised to some extent to make that abundantly and explicitly clear. On the revised procedure, which is the basis of the free exercise claim for Ms. Willey as a teacher, the policy changes. And why doesn't that policy at least invoke concerns that it may not be generally applicable under a Fulton analysis? Because it's applicable to everyone. That policy or procedure, sorry, you know, very explicitly stated, any person, for any reason, can ask for a reasonable accommodation. Yeah, sure. But then it also says we'll do our best to accommodate, which sounds to me like it could invite individualized assessment by HR and the school district. Isn't that essentially what Fulton says makes law and policy? I'm sorry? A content-specific assessment of undue burden? I mean, there's no way that you can do the reasonable accommodation undue burden analysis under Groff that is absolutely required by the Supreme Court under law without having some sense of an individualized exception or exemption. How do you get to the undue burden analysis? Well, I'm asking about the Fulton cases and general applicability when you look at reasons why an accommodation may be granted. And are those reasons just at the whim of the administrators? Or are there objective criteria? And I just don't see that in this policy. So that's what I'm asking. Right. There are no objectives. There's no criteria at all. If you can't do this, you don't think you can do it, let us know, and we'll do our best to accommodate you. And by do our best, that is the Groff undue burden analysis. That's exactly what it is. They're going to look. And if there's any way, such as shift swapping, et cetera, they're going to do it, period, without analyzing the basis or the reasons for your request. So it appears I'm running out of time here. So with that, I would just ask that the court affirm the district court's grant of summary judgment. And I thank you for your time. Thank you. Rebuttal? Thank you, Your Honors. I have barely two minutes, so I'll get to the point. With respect to this idea of the policy being generally applicable, nothing's further from the truth. Your Honor, you're correct that this idea that somehow we'll have any reason will be sufficient. That's a canard. Here, it gives complete discretion on a subjective basis based on every employee's asserted problem with the policy or request for it. It doesn't indicate that at all, does it? It doesn't indicate that it can be denied for any reason, an accommodation can be denied. It doesn't say anything at all about that. What I'm saying, Judge, it provides a subjective review, individual by individual, and then attendant with that, the discretion to decide, yes, we'll give you an accommodation or no, we won't. I'm saying the policy doesn't even indicate it will be a subjective review. It simply seems to indicate we'll accept your reason and we'll do our best, whatever that means. Whatever that means. But it seems to accept the rationale and say, ask for your accommodation, we will do our best to accommodate it, meaning we're going to try to accommodate it, whatever the reason. It's a convenient trope to allow subjective and individualized decisions regarding a requested accommodation, which clearly takes it now to the level of strict scrutiny and the policy cannot survive that. Moving on, this idea of not sufficient evidence. In this case, there are plenty of instances where we have disputes of material fact. The most glaring and obvious is the four teachers who testified. The appellee conveniently ignored Jessica Pulaski in its briefing because she testified that the policy was, in fact, compulsory, and that if she did not follow it, she would be terminated. Now, that creates a glaring issue of material fact. I could go on. The chairman of the board stated as much. Your time, you'll need to close up. I'm sorry, I have a question. Counsel, can I ask you two questions about the scope of the appeal? Is Ms. Willey still employed as a teacher at Sweetwater School District? No, sir, she is not. She's not? No. How does that change our assessment whether there's still a live case or controversy before us? Well, I think you're talking with her First Amendment as a teacher claim, Judge? Yes. Yes. Well, I think that's an excellent question. I don't have an excellent answer for you. However, there were damages that were inflicted on her as a result of her not being provided the accommodations she needed, and then you've got an evidence of a warning letter, et cetera. Okay, let me ask you one more about the scope of the appeal. You sued both the school district but also a list of individual defendants. Final judgment was entered on behalf of all defendants, but in the briefs I don't see anything that argues about the individual defendants and their liability. Have you forsaken or waived that argument as to the individual defendants? Well, it depends on what this court does. I believe that that was the wrong decision. Yeah, but you didn't tell us why in your briefs. No, I realize that, Your Honor. I realize that. Okay. Yes, Judge? Any other questions? Thank you. Your time's up. Okay, I'm sorry. If I may, Judge, I'd just like to leave you with an admonition and warning that was given to us by the 35th President of the United States. When a fundamental and articulated right is compromised as to one citizen, the rights of all citizens are threatened. Thank you. Thank you. Thank you, counsel. We appreciate your arguments. The case will be submitted and counsel are excused.